LYNNETTE COOK
228 W. Garden Park
Orem, Utah 84057
Telephone: (435) 919-8240
Email: lovelylynnettest@gmail.com

RODNEY JAY VESSELS
230 W. Garden Park
Orem, Utah 84057
Telephone: (612) 570-1199
Email: ssevdor@gmail.com

JULIE LITTLE TAGGART
225 S. 300 E. #507
Salt Lake City, Utah 84111
Telephone: (801) 577-1928
Email: JLT1920@yahoo.com

*Pro Se Plaintiffs*



FILED
U. DISTRICT COURT

2020 FEB 10  A 10: 07

DISTRICT OF UTAH

DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LYNNETTE COOK, RODNEY JAY VESSELS, JULIE LITTLE TAGGART<br><br>*Pro Se* Plaintiffs,<br><br>vs.<br><br>THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, A UTAH CORPORATION SOLE.,<br><br>Defendant | Case Number:<br><br>COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE FEDERAL RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT<br><br>DEMAND FOR A JURY TRIAL<br><br>REQUEST FOR SUPPLEMENTAL JURISDICTION OVER STATE FRAUD CLAIMS |

## INTRODUCTION

1. Plaintiffs bring this civil action against Defendant and the Church of Jesus Christ of Latter-day Saints (both, hereinafter, the "Church") for violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964.

2. In addition, Plaintiffs are seeking supplemental jurisdiction over state fraud claims, which are alleged as part of this lawsuit.

Case: 2:20-cv-00080
Assigned To : Barlow, David B.
Assign. Date : 2/10/2020
Description: Cook et al v. Corporation of the President of the Church of Jesus Christ of Latter-day Saints, The

3. The Church is currently engaged and has for decades been engaged in a scheme to extract tithing (defined below) from its members, including Plaintiffs, based on false claims, pretenses, misinformation, misdirection, and lies.

4. The Church engages in the aforementioned scheme by introducing the *Book of Mormon* (hereinafter, "BOM") as the "keystone" of the Church's religion, without abiding by any of the BOM's doctrines, precepts, and teachings.

5. The BOM is what convinced Plaintiffs to believe in the Church, which Church then demanded that they pay a considerable amount of tithing and offerings contrary to the BOM's teaching that "salvation is free" (BOM; 2 Nephi 2:4). The Church enforces this financial obligation under threat of withholding sacred temple ordinances, which they falsely claim are necessary for exaltation. They also use the threat of damnation, burnings, endless torment, outer darkness, and subjection to the power and influence of an imaginary being, as defined by the Church's false doctrine.

6. Nonmember investigators read the BOM and become convinced of its truths as another word of God, together with the Bible. They are then seduced into joining the Church, which does not follow the tenets of the BOM and is, in fact, condemned by the BOM, as described in this Complaint.

7. The doctrines, commandments, precepts, principles, and ordinances of the Church have nothing to do with what is written in the BOM. In fact, the Church's doctrines are diametrically opposed to what is written in the BOM.

8. The Church's members are manipulated into submission and servitude through fraudulent means, by false claims of alleged infallibility of the Church's prophet, currently Russell M. Nelson, who promises members of the church prosperity and exaltation as gods and goddesses, if they will obey him.

9. Through manipulation, brainwashing, and intimidation, the Church's members are the least likely of all churchgoers to question their church's finances, according to a recent report. (Salt Lake Tribune, January 31, 2020.)

10. The Church controls and misleads its members, by demanding tithing and offerings to enrich the Church and its leaders, who have "set themselves up for a light unto the world, that they may get gain and praise of the world" (BOM; 2 Nephi 26:29), which is condemned as "priestcrafts" in the BOM (id.).

11. The BOM clearly condemns the Church for "transfigur[ing] the holy word of God" (BOM; Mormon 8:33) for the purpose "to get gain." (BOM; 1 Nephi 22:23.) The leaders of the Church wear "fine apparel [that can be purchased from the Church's multi-billion-dollar City Creek Mall], and [love] the adorning of [their] churches

[meetinghouses and temples], more than [they] love the poor and the needy, the sick and the afflicted." (BOM; Mormon 8:37.)

12. The Church solicits donations of personal property to its Deseret Industries, under the guise of helping the poor and the needy, hires cheap labor and requires hours of volunteer service from members, so that it can resell the property to get gain.

13. The Church justifies its wealth and the purpose for its oppressive tithing and offerings requirements, by touting its extensive humanitarian efforts. At trial, Plaintiffs will present substantial evidence that the Church's humanitarian efforts actually cause and exacerbate poverty by destroying local economic infrastructures.

14. FURTHERMORE, the Church has amassed billions of dollars in savings and investment portfolios, which further proves that tithing and offerings are not being used as the Church claims to its members.

15. The Church forces members to do genealogy work as doctrine and a commandment from God, which is condemned in the BOM as "the things which are pleasing unto the world [but not] unto God and those who are not of the world." (BOM; 1 Nephi 6:5.)

16. Members are deceived by the Church into believing that genealogy work is necessary to "redeem the dead" (part of the Church's alleged mission), who have died "without law" (*Doctrine and Covenants*, section 76, verse 72) (i.e., those who have not accepted the Church's doctrine and ordinances while alive).

17. Redemption of the dead is a doctrine that is clearly condemned in the BOM as a "mockery before God" and "putting trust in dead works." (BOM; Moroni 8:23.)

18. The Church, through the commission of at least two predicate acts constituting a "pattern of racketeering" enterprise, directly conducts and participates in the conduct of the affairs of such enterprise.

19. The Church engaged in more than one of the enumerated RICO crimes set forth with particularity in this Complaint, pursuant to 18 U.S.C. § 1962, continuously over a number of years, against Plaintiffs and other victims, using the same methods, including federal mail and wire fraud and other federal law fraud violations, which are stated with particularity in this Complaint, below, as well as state law violations, which are sought to be included in review by the Court pursuant to Plaintiffs' request for supplemental jurisdiction.

20. The Church used and invested, directly or indirectly, income and interest from its racketeering activities, as set forth with particularity in this Complaint, as alleged in this Complaint.

## NATURE OF THE CASE

### What this Case is NOT About

21. This lawsuit is not about money. Although Plaintiffs are entitled to the monetary remedies provided in 18 U.S.C. § 1962(c), the motivation for this lawsuit is described in "**What This Case IS About**, below.

22. This lawsuit does not contend against Joseph Smith, Jr. and his experiences, as the *alleged* founder of the Church.

23. It does not contend against the BOM, nor does it attack any truths that may be found in that book.

24. This lawsuit does not contend against the theology of the Church, except as this theology misleads, deceives, misdirects, and convinces members to pay tithing and offerings and support the Church in purposes that are in direct opposition to the tenets of the BOM, which book was why Plaintiffs either joined the Church and supported it in the first place or why those raised in the Church faithfully and dutifully continued to supported it.

25. This case does not contest the right of any human to practice the 11th Article of Faith, as taught by Joseph Smith, Jr.: "We claim the privilege of worshiping Almighty God according to the dictates of our own conscience, and allow all men the same privilege, let them worship how, where, or what they may."

26. This lawsuit does not mock or dispute the free and fair exercise of any religion or religious tenet.

27. It does not ask the Court to determine the truth or falsity of the Church or its religion, except for its violations of the law, as described in this Complaint.

28. This case does not ask the Court to adjudicate different belief systems, as long as those belief systems do not systematically, fraudulently and unlawfully take money and/or property from others under false, malicious or fraudulent pretenses.

29. This lawsuit does not prescribe or proscribe how humans are to experience God.

30. It does not question or contend against the nature of God or any religion or human experience built around him or her or it.

31. Finally, this case does not infringe any right of any religion, except where such religion infringes upon the personal rights and pecuniary interests of others through illegal and fraudulent means.

### What this Case IS About

32. On January 20, 2020, Plaintiffs offered to settle this matter with the Church, so that the Church could

avoid this lawsuit and any subsequent publicity.   A draft complaint was provided to the Church, together with Plaintiffs' discovery of the Church's $100 billion fund that hoards Church members' tithing and offerings.

33. On January 30, 2020, Plaintiffs submitted to the Church a redrafted complaint, giving the Church until the end of the day Monday, February 3, 2020 to respond.

34. Soon after submitting our redrafted complaint, Plaintiffs received a letter from David J. Jordan of Stoel Rives LLP, attorneys for the Church, alleging that Plaintiffs' claims "are not cognizable under the Constitution of the United States" and that they "would be subject to dismissal." There was no offer to meet with Plaintiffs; rather, Plaintiffs were told that their claims "are squarely barred by the Constitution and, if filed, would be in violation of Rule 11."

35. The Church's legal counsel attempted to cite legal precedent to claim that what the Church does is protected under the U.S. Constitution's First Amendment. The attorneys for the Church deliberately ignored that the First Amendment of the U.S. Constitution does not protect acts of fraud. Furthermore, this case is unprecedented, and Plaintiffs will prove that there has never been a case brought before any U.S. Court that contains the material facts, allegations, and evidence that their case presents.

36. This lawsuit is about violations of the civil RICO provisions of federal law that are of national and international interest, which violations weaken the stability of national and international economic systems, harming innocent humans and interfering with the free exercise of conscience and of the right to exist as unoppressed human beings.

37. Plaintiffs allege a pattern of inter-related RICO violations that constitute repeated conduct with the obvious threat of repetition and continuity in the future.

38. The Church's fraudulent activities are exactly the kinds of societal threats that are the target of RICO law.

39. This case is about the Church's burden on interstate and foreign commerce in a conspiracy that directly involves a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and (d), which threatens the domestic security and undermines the general welfare of nations and their citizens.

40. This lawsuit supports and validates the good that is found in the BOM.

41. It is about inconsistencies between the Church and the express words of the BOM, which inconsistencies allow the Church to commit fraudulent acts against members and nonmembers.

42. It contends against the fraudulent claims perpetrated by the Church that it is following the BOM when, in

fact, it misrepresents and does not support the teachings contained within the BOM.

43. This lawsuit contends against the Church's fraudulent misuse of the name and legacy of Joseph Smith, Jr.

44. It contests the Church's misuse of religion to coerce, manipulate, deceive and defraud individuals, by misappropriating their income under the guise of providing for the poor and the unfortunate when, in fact, the money is hoarded to make the Church the richest church and religion in the world.

45. This lawsuit contends against the misrepresentations of the Church that its theology has anything to do with Joseph Smith, Jr. or with the BOM.

46. This lawsuit is about illegal and unlawful abuse and fraud committed by men in high places, namely the leaders of the Church, in a scheme in secret combination with business, political, and religious machinations and secret plans of purveyors of injustice, who spread lies and create unfairness, contrary to the rule of law.

47. This case supports the First Amendment, which provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Constitution, Amendment I. It is well settled, however, that the First Amendment does not protect acts of fraud.

48. This lawsuit contends that the legal system and its courts have a responsibility to protect the public and members of a church whose leaders take money fraudulently, hoard it, and leave the monies unused for charitable purposes.

49. This lawsuit seeks to hold accountable a church that binds the consciences of humans through deception and coercive persuasion (hereinafter "brainwashing").

50. For example, young children, as early as age three, are brainwashed continually on the subject of tithing, through music and object lessons. Their whole life, they are expected to attend annual "tithing settlements" with their family, where they are rewarded for paying their own tithing.

51. This case upholds the full and free right of humans to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine, as long as such beliefs, principles and doctrines do not violate the property, personal rights and pecuniary interests of others in a deceptive, fraudulent or unlawful manner.

52. All of the allegations of this Complaint are grounded in provable violations of the provisions of the RICO statutes and in provable violations of state law, to the extent that supplemental jurisdiction is granted in this case.

53. All of the allegations of this Complaint, including the allegations of criminality and fraud, belong in a court of law.

## PARTIES

54. Plaintiffs were members of the Church in good standing for many years.

55. Plaintiffs' allegations are based upon their personal knowledge and experience as former members of the Church and, as to all other matters, are based upon information and belief, including investigations conducted by expert witnesses, who will be identified as required by the Court, as well as information leaked to the media and discovered in other public sources.

56. Plaintiffs are citizens of the United States, residing in the state of Utah.

57. Upon information and belief, Plaintiffs allege the following concerning the Church and its leadership, businesses and legal entities:

58. The Corporation of the President of the Church of Jesus Christ of Latter-day Saints is a corporation sole duly organized and operating since 1923 pursuant to the laws of the State of Utah.

59. The Church is or claims to be a religious nonprofit organization.

60. The paid "prophets, seers, and revelators" of the Church (as they call themselves), as of the date of the filing of this Complaint, are the following:

61. Russell M. Nelson, Dallin H. Oaks, Henry B. Eyring, M. Russell Ballard, Jeffrey R. Holland, Dieter F. Uchtdorf, David A. Bednar, Quentin L. Cook, D. Todd Christofferson, Neil L. Andersen, Ronald A. Rasband, Gary E. Stevenson, Dale G. Renlund, Gerritt W. Gong, and Ulisses Soares.

62. The registered address of the Corporation of the President of the Church of Jesus Christ of Latter-day Saints is located at 50 East North Temple, Salt Lake City, Utah, 84150. The Office of the First Presidency is the Church Administration Building, located at 47 East South Temple, Salt Lake City, Utah 84150. The Registered Agent for the Church is Corporate Agent Services, LLC, located at 36 S. State St., Ste 1900, Salt Lake City, Utah 84111.

63. The unpaid local authorities of the Church include the following "stake" and "ward" officers: stake presidents and their counselors, ward bishops and their counselors, stake high councilmen, and stake and ward executive officers, among others.

## JURISDICTION AND VENUE

64. The Court possesses jurisdiction under 28 U.S.C. § 1331, because Plaintiffs' claims present federal questions.

65. Venue is proper in the United States District Court for the District of Utah.

## FACTS

66. Plaintiffs incorporate by reference the facts previously stated in this Complaint.

67. Each Plaintiff contributed at least tens of thousands of dollars, and up to hundreds of thousands of dollars, to the Church in the form of tithing and offerings, with the understanding that the Church was using the tithing and offerings for the purposes identified by the Church, which turned out to be false.

68. Each Plaintiff was damaged in an amount to be proven at trial, but not less than any jurisdictional amounts required by the Court, through the fraudulent and illegal methods by which the Church hid its spending from the public and from the members of the Church and hoarded its assets.

69. Plaintiffs did not make the discovery that the Church was in violation of RICO, 18 U.S.C. § 1964, until discovering the December 17, 2019 article in the Washington Post concerning the $100 billion tax-exempt investment fund of the Church. (https://www.washingtonpost.com/investigations/mormon-church-has-misled-members-on-100-billion-tax-exempt-investment-fund-whistleblower-alleges/2019/12/16/e3619bd2-2004-11ea-86f3-3b5019d451db_story.html.)

The Church worked in secret combination (see BOM; Ether 8:19) with the investment adviser for the fund, Ensign Peak Advisors, to hide the hoarded money from members of the Church and the public, so that tithing and offerings would not decrease and so that the Church would not be criticized or penalized for its deceit.

70. The statute of limitations for a civil RICO claim runs from the date that Plaintiffs knew or should have known that the elements of a civil RICO cause of action existed.

71. As a part of the same pattern of racketeering activity, there were further injuries to Plaintiffs and further predicate acts, causing the accrual period for the statute of limitations to run from the time when Plaintiffs knew or should have known of the last injury and last predicate act, which are part of the same pattern of racketeering activity.

72. Prior to their discovery, Plaintiffs had assumed that the Church was using tithing in the way that the Church had claimed to its members and to the public, although the Church has refused to provide material disclosure

concerning its finances during its annual and semi-annual general conferences in recent decades and has hidden its financial information from members of the Church and the public.

73. The Church falsely claimed that it used the tithing and offerings "in worldwide efforts to love God and neighbor." (20 December 2019 Salt Lake City News Release: "How the Church of Jesus Christ Uses Tithes and Donations.")

74. The Church falsely claimed that it "is committed to helping the poor and the needy." (Id.)

75. The Church falsely claimed that it had "a global program that primarily benefits those who are not Latter-day Saints," partnering "with many global organizations like the Red Cross to provide assistance." (Id.)

76. The Church claimed that it "has given more than $2.2 billion in aid in 197 countries since it was created in 1985" (Id.), which was, in fact, an admission against interest that it had only paid on average, a mere $63 million a year against billions of dollars of tithing and offerings collected annually from members of the Church.

77. The Church is currently operating 160 temples, has 15 new temples under construction, is remodeling seven temples and has announced an additional 35 new temples. These are expensive and opulent temples in which work to redeem the dead is or will be conducted in direct violation of the BOM. Only members who pay a full tithing can attend these temples, which are used for ceremonial purposes, rather than to shelter, clothe, and feed the poor.

78. The Church built a luxurious Conference Center, with a stand that rises above the congregation, so that its leaders have their own "Rameumpton, which, being interpreted, is the holy stand." (BOM; Alma 31:21.)

79. The Church paid as much as $3 billion towards an expensive and opulent mall, The City Creek Center, which appeals to the rich and the elite and also displaces the poor, because the poor's appearance in and around the Church's Temple Square did not appeal to the Church's leadership and its desire "to get power over the flesh" and "become popular in the eyes of the world, and those who seek the lusts of the flesh and the things of the world" (BOM; 1 Nephi 22:23), all of which "things of the world" are prominently available at the City Creek Mall and in direct violation of BOM teachings.

80. The Church spent billions of dollars on stake centers and ward meetinghouses as places of alleged worship, instead of housing the poor and the downtrodden.

81. The Church spent billions of dollars on genealogical research facilities and family history centers, as well as on the database "FamilySearch" and on the for-profit genealogical company, Ancestry.com, LLC, while its

members spent millions of hours on endless genealogies.

82. The Church spent billions of dollars proselytizing nonmembers through its missionary program, and paid salaries, housing, office and automobile expenses for its mission presidents, all the while extracting expenses from tens of thousands of young and elderly missionaries, who paid for all or most of their mission expenses.

83. The Church also extracted contributions from its members to fund facilities, education and activity programs, and family history centers for its 30,500 congregations.

84. The Church funded universities, a business college, and seminary and institute programs with member contributions.

85. The Church promised its members prosperity if they faithfully paid their tithing and offerings to the Church, claiming that they "shall prosper in the land," (BOM; Alma 50:20) when, in fact, millions of Church members throughout the world suffer in abject poverty. Yet, these poor members are still required to pay tithing despite their impoverished lives, condemning them to remain in the poverty which they are experiencing. This requirement clearly contradicts the BOM, where it specifically states that all riches and wealth, especially that which the Church has amassed, should be used "for the intent to do good—to clothe the naked, and to feed the hungry, and to liberate the captive, and administer relief to the sick and the afflicted." (BOM; Jacob 2:19.)

86. Through its secret combinations with business, political, and religious leaders, the Church supports conservative and often Republican policies that prevent native Americans living in South America from unconditionally and liberally entering the United States, which the BOM presents as *their* "promised land." (BOM; 2 Nephi 24:2.) These native Americans were promised in the BOM that they "shall be nursed by the Gentiles" (the Church that touts the BOM as its "keystone"); and that their "children" (native Americans) shall be "carried in their arms, and their daughters ... carried upon their shoulder, [in that] these things of which are spoken are temporal"—*temporal* meaning providing the basic necessities and securities of life to the people of which the BOM refers. (BOM; 1 Nephi 22:6.)

## CAUSES OF ACTION

87. The conduct of the Church constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

88. The Church violated federal law as set forth herein, which directly and proximately injured Plaintiffs, constituting a continuous course of conduct that was intended to defraud Plaintiffs of money and property through

false representations, fraud, deceit, and other improper and unlawful means.

89. The illegal and fraudulent actions of the Church were racketeering activities, as defined by 18 U.S.C. §§ 1961(1) and (5). In addition, the Church engaged and continues to engage in classic overt conspiracy acts that also qualify as RICO violations.

90. Plaintiffs were injured in their money and property and emotional state by reason of the Church's violation of 18 U.S.C. § 1962(c). 18 U.S.C. § 1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in or affecting interstate or foreign commerce to conduct or participate in the conduct of such enterprise's affairs through a pattern of racketeering activity.

91. Said injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the Church's violations of 18 U.S.C. § 1962.

92. Plaintiffs are and were victims of the unlawful enterprises of the Church.

93. Plaintiffs have been and will continue to be injured by said enterprises.

94. Pursuant to 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover treble damages, plus costs from the Church, as well as any other relief authorized by statute.

95. The Church has unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d). 18 U.S.C. § 1962(d) makes it unlawful for any person to conspire to violate any of the provisions of 18 U.S.C. § 1962.

96. The Church's conspiracy commenced decades before Plaintiffs became members of the Church and remained ongoing while Plaintiffs were members of the Church.

97. The conspiracy's purpose was to defraud Plaintiffs of money and property.

98. The Church committed multiple illegal acts in furtherance of such conspiracy.

99. These acts in furtherance of the conspiracy included, but are not limited to, the acts set forth in this Complaint.

100. The Church knew that it was engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were racketeering activities.

101. The Church's participation in such illegal acts and its conspiring with business, political, and religious leaders allowed it to commit this pattern of racketeering activity and constituted a conspiracy to violate 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).

102. The Church's conspiracy with politicians, business leaders and other religionists constituted racketeering activities and included overt acts taken in furtherance of said activities, in violation of 18 U.S.C. § 1962(d).

103. The Church knew that its actions described in this lawsuit were false and fraudulent, and yet it deliberately ignored or recklessly disregarded the falsity and fraudulent nature of its actions.

104. Plaintiffs were damaged by the Church in an amount to be proven at trial.

### FIRST CAUSE OF ACTION

### (Violations of Federal Civil RICO—Conduct of a RICO Enterprise, 18 U.S.C. § 1962(c))

105. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

106. At all relevant times, the Church was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

107. The Church violated 18 U.S.C. § 1962(c) by the acts described in the paragraphs above and below.

**The Enterprise**

108. At all relevant times, the Church constituted an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

109. 18 U.S.C. §§ 1962(a) makes it unlawful for any person who has received any income derived from a pattern of racketeering activity to use or invest any part of that income in the acquisition or operation of any enterprise which is engaged in or affects interstate or foreign commerce.

110. 18 U.S.C. §§ 1962(b) makes it unlawful for any person through a pattern of racketeering activity to acquire or maintain any interest in or control of any enterprise which is engaged in or affects interstate or foreign commerce.

111. At all relevant times, the Church was engaged in, and its activities affected by, interstate commerce and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

112. The Church did knowingly, willfully, and unlawfully conduct a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), through multiple instances of illegal activities and of fraud including Mail Fraud and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

113. Plaintiffs were damaged by the Church in the amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Use of the Mails and Wires to Defraud, in violation of 18 U.S.C. §§ 1341 and 1343)

114. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

115. The Church, through the use of the mails and wires, devised and intended to devise a scheme to defraud Plaintiffs of money, property, and other benefits of monetary value in violation of 18 U.S.C. §§ 1341 and 1343.

116. The Church used the U.S. Postal Service and interstate wires and caused the U.S. Postal Service and interstate wires to be used for the purpose of advancing, furthering, executing, concealing, conducting, participating in, and carrying out a scheme to defraud within the meaning of 18 U.S.C. §§ 1341 and 1343.

117. The Church knew and could reasonably foresee that the U.S. Postal Service and interstate wires would be used for said purposes.

118. The Church's use of the U.S. Postal Service and interstate wires described above was with the specific intent to defraud its members, including Plaintiffs, and their money and property, in violation of 18 U.S.C. §§ 1341and 1343, which constituted racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

119. The Church's members and former members, including Plaintiffs, suffered, continue to suffer, and will suffer in the future substantial injuries by reason of the Church's acts of racketeering.

120. Plaintiffs were damaged by the Church's fraudulent use of the U.S. Postal Service and interstate wires.

121. Plaintiffs damages were in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Money Laundering in Violation of 18 U.S.C § 1956(a)(1)(A)(i))

122. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

123. The Church has engaged in multiple predicate acts of money laundering through its hoarding and hiding of assets, as described in this Complaint.

124. Plaintiffs were damaged by the Church's money laundering scheme, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### (State Law Claims, pursuant to Request for Supplemental Jurisdiction)

**Additional Factual Allegations**

125. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

126. The Church has created a secret combination of religious, political, and business leaders that helped enable the church to become the wealthiest church in the entire world.

127. The Church has amassed its wealth through hoarding and investing assets gathered by requiring members to give tithing and offerings.

128. The Church uses a fraudulent scheme to deceive people and entice them into the Church.

129. The missionaries of the Church introduce nonmembers to the BOM, which is said to contain "the fulness of the everlasting gospel" "as delivered by the Savior to the ancient inhabitants" of the Americas. (BOM; The Testimony of the Prophet Joseph Smith; Pearl of Great Price; Joseph Smith–History 1.)

130. The BOM is a beautiful book that contains the same or nearly identical words of the Sermon on the Mount, first revealed in the *New Testament* of the *Bible* and then presented in almost identical words in the BOM. (See Matthew 5–7 of the *New Testament* and 3 Nephi 12–14 of the BOM.)

131. When nonmembers are introduced to the BOM, many can feel the power of its words and, in millions of cases, these nonmembers accept the fraudulent lie that the Church is responsible for and the custodial protector and implementor of the words in the BOM.

132. The Church's missionaries, general authorities, local leaders, and teachers are instructed to mislead members and nonmembers, claiming that the BOM proves that the Church is "the only true and living church." (*Doctrine and Covenants*; 1:30.)

133. In practice, however, the Church totally ignores the powerful message of the BOM and inserts in its place false doctrines, including vain and foolish promises that families can be together forever, subject to false ordinances, rituals, temple attendance requirements, church attendance requirements, tithing requirements, and endless genealogies.

134. The Church snares the souls of the unexpectant victims, claiming that if the BOM is true, then the Church must be true.

135. After joining the Church, members find that the tenets of the BOM have nothing to do with the Church, except to condemn the Church.

136. The Church requires its members to listen to and obey its president, currently Russell M. Nelson, as if infallible, claiming that the president will not lead the members of the Church astray.

137. Members are coerced into paying billions of dollars of tithing, which is stockpiled by the Church to increase its wealth, until today the Church has become the richest church in the world, enabling it to conspire with politicians, business leaders, and other religionists to control and exercise dominion over humans worldwide.

138. The BOM plays no role in the Church's doctrine; and thus, the Church uses a bait and switch tactic, while pressuring members with threats of shunning, disfellowship, excommunication, and eternal damnation for failing to heed the requirements of the Church.

139. Plaintiffs were damaged by the Church in an amount to be proven at trial.

**Misrepresentations of Material Fact**

140. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

141. The Church misrepresents itself to its members, investigators, and to the public, claiming that it is the ultimate and supreme practitioner of the BOM, when, in fact, it fails to practice the BOM's most basic and important tenets.

142. The Church knowingly devised and knowingly participated in a scheme and artifice to defraud its members and investigators, including Plaintiffs, by means of false and fraudulent pretenses, representations, and promises.

143. Plaintiffs were damaged by the Church in an amount to be proven at trial.

**Common Law Fraud**

144. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

145. The Church commits common law fraud by making materially false representations of fact about its acceptance of and compliance with the tenets of the BOM, knowing that its representations are false.

146. The Church intends that its false misrepresentations will be acted upon by its members and investigators, including Plaintiffs, who acted reasonably in believing the Church's claims.

147. The Church's materially false statements of fact included its fact claims with respect to the BOM and its false claims with respect to the use of the tithing and offerings of its members, including Plaintiffs, which were hoarded and not used according to the false promises and representations made by the Church.

148. Members and investigators of the Church, including Plaintiffs, were injured by said misrepresentations, in an amount to be proven at trial.

**Fraudulent Inducement**

149. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

150. The fraudulent practices of the Church resulted in the deception of its members and investigators.

151. These deceptions were and are of material importance to reasonable decisions made by the Church's members and investigators to become or continue to remain members of the Church, to their financial detriment.

152. These deceptions damaged Plaintiffs in an amount to be proven at trial.

**Fraudulent Concealment**

153. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

154. The Church wrongfully concealed both its failure to follow the tenets of the BOM and the hoarding of member tithing and offerings.

155. This concealment prevented Plaintiffs from discovering the Church's hoarding of member tithing and offerings, until recently revealed to Plaintiffs, as described above.

156. Plaintiffs exercised reasonable due diligence in attempting to discover the real truth but, because of such concealment, were unable to do so.

157. Plaintiffs were damaged by such concealment, in an amount to be proven at trial.

**Intentional Infliction of Emotional Distress**

158. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

159. The behavior and conduct of the Church and its leaders towards its members and investigators are outrageous.

160. The Church intended and intends to cause emotional distress to its members and investors, including

Plaintiffs.

161. The Church is in reckless disregard of the probability of causing emotional distress to its members and investigators, including Plaintiffs.

162. Plaintiffs have suffered severe emotional distress directly from the Church's outrageous behavior.

163. Such distress caused damages to Plaintiffs in an amount to be proven at trial.

**Humanitarian Fraud**

164. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

165. The fraudulent humanitarian aid allegedly provided by the Church has brought severe negative emotional and economic harm to the indigenous people of the Western Hemisphere. Known as the "Lamanites" in the BOM, this includes all native Americans of both the North and South American continents.

166. The Church's humanitarian efforts negatively affect local economic infrastructures.

167. The goods and services provided by the Church allegedly for humanitarian purposes are not produced in the local economic infrastructures or from employment opportunities created for the local people where the poverty exists.

168. The local people do not have the money to purchase these goods and services; therefore, there is no need for the establishment and support of any type of local economic infrastructure, nor can one be established, as long as foreign goods and services are provided.

169. In all areas of the world where poverty existed before any of the Church's humanitarian efforts were introduced, the local economy was left devastated and in a condition much worse off than it was before the Church interfered with the local economy of the poor it was purporting to assist.

170. Church volunteer service by its members eliminates employment opportunities for the poor allegedly served by the fraudulent humanitarian aid.

171. Tithing obligations imposed on impoverished nations remove 10% of the Potential Gross Domestic Product ("GDP") from the local economies.

172. The Church's alleged humanitarian efforts establish and promote cultures of dependency.

173. The Church does not use any of its billions of dollars of tithing proceeds to help the poor.

174. When the people in poor areas pay their tithing to the Church, the GDP decreases proportionately.

175. The Church should be disgorged with respect to its vast hoarding of tithing money and its investments therein, in an amount to be determined at trial.

## REQUEST FOR RELIEF

176. WHEREFORE, Plaintiffs pray for the following relief:

### Injunctive Relief

177. An order for injunctive relief against the Church, prohibiting the Church from doing any of the following:

178. An order that the Church and its leaders and members are prohibited from claiming that the BOM is the "keystone" of the religion of the Church.

179. An order that the leaders, members, and missionaries of the Church are prohibited from claiming that the BOM proves or is evidence of the truthfulness of the Church.

180. An order prohibiting the Church and its leaders, missionaries, and members from claiming that the Church follows the teachings of the BOM.

181. An order prohibiting the Church from claiming that the tithing and offerings members give to the Church have had any benefit for those who are not members of the Church.

182. An order prohibiting the Church from claiming that it has done anything to truly help the poor and the needy outside of the members of the Church.

183. An order prohibiting the Church from claiming that it has done good for the poor that it has alleged to have helped through its so-called humanitarian efforts, when, in fact it has done great evil.

### Other Relief

184. An award of special damages in the actual out-of-pocket monetary loss in the sum of the amount that each Plaintiff has paid in tithing and contributions over the course of his or her affiliation with the Church.

185. A punitive award of treble damages for each Plaintiff, as provided under the RICO statutes.

186. An award of actual costs required by Plaintiffs to bring and maintain this lawsuit.

187. Punitive damages for all common law fraud, breach of fiduciary duty, and intentional infliction of emotional distress claims.

188. An order for interest at the judicial rate.

189. Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

190. Plaintiffs request a trial by jury.

Respectfully Submitted,

Dated: the 10th day of February, 2020

By:

*[signature]*

LYNNETTE COOK
*Pro Se*
228 W. Garden Park
Orem, Utah 84057
Telephone (435) 919-8240
Email lovelylynnettest@gmail.com

*[signature]*

RODNEY JAY VESSELS
*Pro Se*
230 W. Garden Park
Orem, Utah 84057
Telephone (612) 570-1199
Email ssevdor@gmail.com

*[signature]*

JULIE LITTLE TAGGART
*Pro Se*
225 S. 300 E. #507
Salt Lake City, Utah 84111
Telephone (801) 577-1928
Email JLT1920@yahoo.com